UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Allen Newman and Deborah Newman,
d/b/a Twin Haven Mink Ranch,

Plaintiffs,

vs. MEMORANDUM ORDER

United Vaccines, Inc., a division
of Harlan Sprague Dawley, Inc.,

Defendant. Civ. No. 00-257 (RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 22nd day of February, 2002.

## I. Introduction

This matter came before the undersigned United States Magistrate Judge, pursuant to the consent of the parties, as authorized by Title 18 U.S.C. §636(c), upon the Motion of the Defendant United Vaccines, Inc., for Summary Judgment, and upon the Motion of the Plaintiffs, Allen and Deborah Newman, to Strike the Affidavits and Reply Brief of the Defendant. A Hearing on the Motions was conducted on September 12, 2001, at which time, the Plaintiffs appeared by H. Morrison Kershner, Adrian P. Schoone, and Chris G. Halverson, Esqs., and the Defendant appeared by Scott P. Drawe, Esq.

47

FILED FEB 22 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

For reasons which follow, we grant the Defendant's Motion, except as to the Plaintiffs' express warranty and false representation claims, which survive Summary Judgment in part, and we deny the Plaintiffs' Motion to Strike the Affidavits and Reply Brief of the Defendant.[1]

---

[1]At the time of the Hearing, we advised the parties that, even though the Plaintiffs' Motion to Strike, on procedural grounds, had some merit -- since the Affidavits sought to be stricken were filed in conjunction with a Reply Brief in contravention of D. Minn. LR7.1(b)(1)(c), and the Reply Brief exceeded the page limitations permitted by D. Minn. LR7.1(c) -- we found that these technical infractions were outweighed by our interest in being fully informed on the merits of the parties' respective positions. As a result, we extended an opportunity to the Plaintiffs to respond to the materials sought to be stricken, and the Plaintiffs took advantage of the leave so granted, and they filed additional, responsive materials for our consideration. Accordingly, the Plaintiffs' Motion to Strike is denied on these technical grounds.

In addition, the Plaintiffs' predicated their Motion on the further ground that the Affidavits of Christina J. Furseth ("Furseth"), and Janice M. Boyer, were not based on the Affiants' personal knowledge, and included conclusions of ultimate fact and law. Upon our careful review, we are satisfied that both Affidavits are supported by the Affiants' personal knowledge and observations, which are sufficient to allow their consideration for Summary Judgment purposes. See, Rule 56(e), Federal Rules of Civil Procedure (Supporting and opposing affidavits shall be made on personal knowledge * * *."). While Furseth's Affidavit does express certain conclusions, they are undergirded by business records which evade exclusion under Rule 803(6), Federal Rules of Evidence, and are of a type upon which persons with Furseth's training, experience, education, and vocational skills, would reasonably rely. See, Rule 703, Federal Rules of Evidence; cf., United States v. Smith, 964 F.2d 1221, 1224 (D.C. Cir. 1992)(upholding admission of testimony by supervising laboratory technician as to tests performed by subordinate), and cases cited therein. Thus, we deny the Plaintiffs' Motion to Strike on these additional grounds.

(continued...)

## II. Factual and Procedural History

This case arises out of the Plaintiffs' use of the Defendant's vaccine in the operation of their third-generation mink ranch. As is customary in the industry, in mid-July of 1998, the Plaintiffs vaccinated their mink kits, who were then between ten and twelve weeks old, against canine distemper.[2] The Defendant's vaccine, which was administered to the Plaintiffs' mink, was Biocom-DP, which combines two vaccines. One part of the vaccine employs Distemink, which is a live virus "protection against distemper," and which is prepared in biscuit form. The Distemink is dissolved in the second vaccine -- Biocom-P -- which is a "liquid inactivated vaccine for protection against enteritis, botulism and pseudomon-

[1](...continued)
Lastly, the Plaintiffs have sought to strike the Supplemental Affidavit of Furseth, because it was filed without having been signed by the Affiant. See, e.g., Mays v. Rhodes, 255 F.3d 644, 648 (8th Cir. 2001)(recognizing that unsworn statements are hearsay, and are not cognizable on a Summary Judgment Motion). However, the Defendant subsequently filed executed copies of the Supplemental Affidavit, which cures the Plaintiffs' admissibility objection. See, Docket No. 42. As a consequence, we deny the Plaintiffs' Motion to Strike and, in ruling upon the Defendant's Motion for Summary Judgment, we have considered the entirety of the Record presented.

[2]Canine distemper is a viral disease, that can be carried by vermin onto mink farms, and that suppresses the immune system of the mink, so as to render them susceptible to other illnesses. Plaintiffs' Memorandum of Law In Opposition to Defendant's Motion for Summary Judgment ("Plaintiffs' Brief") at 3. Canine distemper in minks can be fatal, and survivors will have poor coats, or may be poor breeders. Id.

as." Memorandum of Law of Defendant United Vaccines, Inc., In Support of Motion for Summary Judgment ("Defendant's Brief") at 2. Since the Defendant's formulation combines an inactivated virus with a live virus, measures must be taken to ensure that the Formalin,[3] which is used to inactivate the virus in Biocom-P, is neutralized, so that it does not inactivate the live virus in the Distemink. Each batch of both vaccines is given a serial number and, at issue in this case, is Biocom-P batch PB13, which was sold to the Plaintiffs, as part of Biocom-DP serial DA52/PB13. Id. at 5.

The Plaintiffs vaccinated 27,600 kits with the Biocom-DP from lot PB13, between July 13 and 17, 1998. See, Affidavit of Allen Newman. On August 28, 1998, the Plaintiffs found five of their mink dead, which marked the beginning of a canine distemper outbreak which, ultimately, caused the Plaintiffs to lose 21,657 of their mink. Id. Many of the surviving mink had poor fur quality, or proved to be poor breeders. Id.

All animal biotics, such as the vaccine at issue here, are regulated by the Federal Government under the Viruses, Serums, Toxin, and Analogous Products Act ("VSTA"), Title 21 U.S.C. §§151-

[3]Formalin is a "formaldehyde solution." Dorland's Illustrated Medical Dictionary, 701 (29th Ed. 2000). In preparing the Biocom-DP, the Defendant "uses a Formalin compound to inactivate or kill the live components in BIOCOM-P." Memorandum of Law of Defendant United Vaccines, Inc. in Support of Motion for Summary Judgment, ("Defendant's Brief") at 7.

159. Under VSTA, all vaccine products, and manufacturing sites, must be licensed by the United States Department of Agriculture ("USDA"). Title 21 U.S.C. §154. VSTA authorizes the Secretary of Agriculture to "make and promulgate from time to time such rules and regulations as may be necessary to prevent the preparation, sale, barter, exchange or shipment * * * of any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product for use in the treatment of domestic animals." Id. Through the Animal and Plant Health Inspection Service ("APHIS"), the USDA, at 9 C.F.R. §§101-124, has promulgated Regulations which govern the licensing of animal vaccines. A party who seeks to manufacture animal vaccines must have both a valid "Veterinary Biologics Establishment License and at least one" valid "Veterinary Biological Product License." 9 C.F.R. §102.2(a).

In order to obtain a Product License from APHIS, a manufacturer must submit an "Outline of Production," which details how the product will be developed and tested, including "test reports and research data sufficient to establish purity, safety, potency, and efficacy of the product." 9 C.F.R. §102.3(b)(2)(ii). Once its Outline of Production is approved, a manufacturer is licensed to produce that biotic. 9 C.F.R. §102.5. Since the Regulations mandate that "[n]o biological product shall be released prior to the completion of tests prescribed in a filed Outline of Produc-

tion," a manufacturer must test each batch of the biotic prior to its sale. 9 C.F.R. §113.1 - 113.5(a). Manufacturers are required to report only the test results to APHIS, which is accomplished by completing Form 2008, and they are not required to furnish the raw data that was employed to calculate those results. See, 9 C.F.R §§112 - 113. A manufacturer must also submit samples of each serial, together with all packaging and accompanying inserts. Id. APHIS may then grant a license based solely upon the manufacturer's data, it may test the sample itself, or it may request and review the manufacturer's raw data. 9 C.F.R. §113.6. Only when APHIS has approved a serial, may the manufacturer sell it.

The Defendant is licensed to manufacture animal biotics, and it was, in 1989, granted a Product License to sell Biocom-DP. Defendant's Brief at 5. In June of 1998, the Defendant performed a viricidal activity test[4] on serial PB13, as required. For Biocom-P, the viricidal activity test required a comparison of titers[5] of Distemink, which had been dissolved in sterile water,

---

[4]Viricidal activity tests are required by APHIS to determine whether the Biocom-P would deactivate the live virus portion of the vaccine -- that is, the Distemink -- thereby rendering the vaccine ineffective when administered to mink. Plaintiffs' Brief at 8, (citing the Affidavit of Dr. Schwartz).

[5]A titer is "the quantity of a substance required to produce a reaction with a given volume of another substance, or the amount of one substance required to correspond with a given amount of an- (continued...)

with Distemink which had been dissolved in Biocom-P. 9 C.F.R. §113.36(c). "If the titer of the [Distemink] rehydrated with the [Biocom-P] is more than 0.7 Log below the titer of the [Distemink] rehydrated with sterile purified water, the product is unsatisfactory for use." 9 C.F.R. §113.36(d). When a test proves a product to be unsatisfactory, the Regulations allow for "one retest to rule out faulty techniques." 9 C.F.R. §113.35(e).

When the Defendant tested PB13, the titer of the Distemink, which had been dissolved in sterile water, was 3.3 Logs, and when dissolved in Biocom-P it was 3.5 Logs, or .2 Logs greater -- a result that the Defendant reported, on its Form 2008, as being "not viricidal." Defendant's Brief at 6. On the same day that the Agency had received the Defendant's Form 2008, APHIS issued the Defendant a conditional license[6] to market the Biocom-DP from seri-

(...continued)
other substance." Dorland's Illustrated Medical Dictionary, 1845 (29th Ed. 2000). Here, the titers are quantified in terms of Logs.

[6]"In order to meet an emergency condition, limited market, local situation, or other special circumstance * * * the Administrator may * * * issue a conditional * * * License to an establishment under an expedited procedure which assures purity and safety, and a reasonable expectation of efficacy," and the "[p]reparation of products under a conditional license shall be in compliance with all applicable regulations and standards." 9 C.F.R. §102.6. At the time that serial PB13 was sold to the Plaintiffs, "there was a need for expedition in the processing of th[o]se serials," because the only other manufacturer of such a vaccine -- American Scientific Laboratories -- would not be producing the vac-
(continued...)

al PB13. On the following day -- June 30, 1998 -- the Defendant sold the PB13 serial to the Plaintiffs. <u>Defendant's Brief</u> at 7-8.

On January 6, 2000, after receiving complaints from several mink farmers, the USDA directed the Defendant to "[i]mmediately stop distribution and sale" of PB13, and it quarantined the remaining inventory of any product containing that serial. <u>Exhibit Q</u>, at TH01364, attached to <u>Affidavit of H. Morrison Kershner</u>. ("Plaintiffs' Ex. Q."). The USDA explained, that the viricidal activity test results "should have been reported on APHIS form 2008 as 'NO TEST' and repeated" and, as a consequence, the Plaintiffs maintain that "the products containing th[o]se serials should not have been shipped before valid testing was completed." <u>Plaintiffs' Memorandum of Law In Opposition to Defendant's Motion for Summary Judgment</u> ("Plaintiffs' Brief") at 10; see also, <u>9 C.F.R. §113.5(d)</u> ("When the initial or any subsequent test is declared a 'No test,' the reasons shall be reported in the test record, the results shall not be considered as final, and the test may be repeated.") The USDA then attempted to correlate the Defendant's test results in its own lab. <u>Id.</u> at 11. To this date, the USDA has never re-released PB13 for sale. <u>Id.</u>

---

(...continued)
cine that year. <u>Exhibit C</u> at 99-100, attached to <u>Affidavit of H. Morrison Kershner</u> ("Plaintiffs' Ex. C.").

The Plaintiffs filed this diversity action against the Defendant, claiming a breach of express warranties, a breach of implied warranties, strict liability, negligence, and false representations. The Plaintiffs have alleged a loss in excess of four million dollars, due to the death of their mink, which they attribute to the Defendant's distemper vaccine. In response, the Defendant has filed a Motion for Summary Judgment which claims that the Plaintiffs' State law claims are preempted by Federal law.

## III. Discussion

Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, Duffy v. McPhillips, 276 F.3d 988, 991 (8th Cir. 2002); Schoolhouse Inc. v. Anderson, 275 F.3d 726, 728 (8th Cir. 2002); Krentz v. Robertson Fire Protection Dist., 228 F.3d 897, 901 (8th Cir. 2000); Curry v. Crist, 226 F.3d 974, 977 (8th Cir. 2000); Carter v. St. Louis Univ., 167 F.3d 398, 400 (8th Cir. 1999). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the

resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the nonmoving party. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Herring v. Canada Life Assurance, 207 F.3d 1026 (8th Cir. 2000); Austin v. Minnesota Mining and Manuf. Co., 193 F.3d 992, 995 (8th Cir. 1999); Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998); Peter v. Wedl, 155 F.3d 992,996 (8th Cir. 1998).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir. 1999); Jauregui v. Carter Manufacturing Co., 173 F.3d 1076, 1085 (8th Cir. 1999). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also,

Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000); Greer v. Schoop, 141 F.3d 824, 826 (8th Cir. 1998). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995); McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 510 (8th Cir. 1995); Settle v. Ross, 992 F.3d 162, 163 (8th Cir. 1993).

As we have noted, the Defendant urges that the Plaintiffs' State law claims are preempted by Federal law. Therefore, although we "give the benefit of all factual inferences to the plaintiff, a finding by the court that the plaintiff's claims are preempted by federal law would entitle the defendant to" Summary Judgment. Murphy v. Smithkline Beecham Animal Health Group, 898 F. Supp. 811, 813-14 (D. Kan. 1995).

A. Standard of Review. The core issue before us is whether the comprehensive Federal regulatory scheme, which has been created by VSTA, preempts the State law claims that have been asserted by the Plaintiffs. The Supremacy Clause of the Constitution directs that "the Laws of the United States * * * shall be the supreme Law of the Land." United States Constitution, Art. VI. It is elemental that Federal laws can preempt State laws, and that such pre-

emption can either be express, as when Congress explicitly states an intent to preempt, or implied, "when federal and state laws directly conflict, when state law stands as an obstacle to accomplishing the purposes of federal law, or when federal law is so pervasive that it reflects an intent to occupy a regulatory field." Symens v. Smithkline Beecham Corp., 152 F.3d 1050, 1053 (8th Cir. 1998)("Symens I"). In addition to preempting State law by its own act, Congress may also expressly, or impliedly, delegate its authority to preempt State law to a Federal Agency. City of New York v. F.C.C., 486 U.S. 57, 63-64 (1988).

In determining whether APHIS preempts the Plaintiffs' State law claims, we do not face a clean slate, for our analysis is closely guided, if not controlled, by our Court of Appeals' decision in Symens I, and its progeny. In Symens I, the Court concluded as follows:

> VSTA as construed by APHIS preempts inconsistent substantive state law "requirements" but not state common law remedies. In this situation, common law claims are **not preempted to the extent that** they seek relief for alleged violations of the federal substantive standards.
>
> * * *
>
> Plaintiffs' broadly pleaded claims are preempted to the extent that they rely upon "liability-creating-premises" that are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency,

purity, or labeling of [defendant's] licensed vaccines.

Symens I, supra at 1055-56.

Since the Court could not determine, on the Record presented on appeal, whether the plaintiffs' claims, in Symens I, fell within the preemptive scope of VSTA, the Court remanded the matter to the District Court for "'a careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement to determine whether [the plaintiffs' claims] f[e]ll within the intended pre-emptive scope' of the federal regime." Symens I, supra at 1056, quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 500 (1996).

Upon remand, the District Court determined that the plaintiffs' state law claims for strict liability, for implied warranties of fitness for a particular purpose, and for merchantability, for false advertising, and for failure to warn, were preempted by VSTA, as they would impose standards upon the defendant that were different from, or in addition to, the substantive Federal standards, while the plaintiffs' claim for "fraud upon the agency" was not preempted, as it relied upon the defendant's purported violation of the APHIS regulations, but was unsupported by sufficient facts to sustain a Jury's Verdict. See, Symens v. SmithKline Beecham Corp., Civ. No. 94-1036 (D.S.D., September 30, 1999)[attached to Defendant's Reply Brief]. On subsequent appeal, the Dis-

trict Court's rulings were affirmed in their entirety. Symens v. SmithKline Beecham Corp., 7 Fed. Appx. 534, 2001 WL 263058 at **1 (8th Cir., March 19, 2001)(Symens II).

Given the holdings in Symens I and II, our Circuit has joined the Court of Appeals for the Seventh Circuit, three District Courts, and the Minnesota Court of Appeals, in extending the preemptive effect of VSTA to all State law claims which impose requirements different from, or in addition to, the requirements of the regulations that have been duly promulgated by APHIS. See, Lynnbrook Farms v. SmithKline Beecham Corp., 79 F.3d 620 (7th Cir. 1996), cert. denied, 519 U.S. 867 (1996); Cooper v. United Vaccines, Inc., 117 F. Supp.2d 864 (E.D. Wis. 2000); Garrelts v. SmithKline Beecham Corp., 943 F. Supp. 1023 (N.D. Ia. 1996), Murphy v. SmithKline Beecham Animal Health Group, 898 F. Supp. 811 (D. Kan. 1995); Brandt v. Marshall Animal Clinic, 540 N.W.2d 870 (Minn. App. 1996), rev. denied (Minn., February 9, 1996).[7] Accordingly,

---

[7]We do note, as the Court did in Garrelts v. Smithkline Beecham Corp., 943 F. Supp. 1023, 1029 n. 2 (N.D. Ia. 1996), that the Court denied a Motion for Summary Judgment without prejudice, on preemption grounds, in Stegmaier v. SmithKline Beecham Animal Health, Inc., Civ. No. 4-95-149, 1996 WL 755721 at *1 (D. Minn., August 22, 1996), but that ruling was not on the merits, and the case appears to have arisen from a "farmer's accidental self-injection of swine vaccine * * *," and not from an alleged harm to non-humans by virtue of an animal vaccine regulated by APHIS.

we examine the Plaintiffs' causes of action, which have been pled here, with the Symens standard as the focus of our review.

The Plaintiffs argue that, because "[i]t is unlawful," under 9 C.F.R. §113.5, "for a manufacturer to release an animal vaccine before completion of the testing required," and because the Defendant obtained its license to market Biocom-DP on the basis of a "No test" which, under 9 C.F.R. §113.5(d) is not considered a final result, the Defendant violated a substantive standard when it sold PB13 serial to the Plaintiffs. No other substantive requirement of VSTA, or of the regulations of APHIS, has been identified by the Plaintiffs of having been violated by the Defendant's marketing of Biocom-DP. For its part, the Defendant denies any substantive violation, and maintains that, even if its testing of the PB13 should have been reported as a "No test," under the circumstances presented here, the regulations merely required a retest, which the Defendant conducted, in January and April of 2000, and which demonstrated, to the satisfaction of APHIS, that the PB13 serial was not viricidal. As a result, the Defendant claims that it satisfied all of the substantive requirements of APHIS's regulations, and that the doctrine of preemption immunizes it from the Plaintiffs' State law claims.

In part, the Defendant urges that we apply a broader sweep of preemption than expressed in Symens I and II, and, for that exten-

sion, it relies upon the Supreme Court's recent decision in Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341 (2001), where the Court extended implied preemption, under the Federal Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Medical Device Amendments of 1976, Title 21 U.S.C. §301, to preclude State law claims in the nature of a "fraud-on-the-agency" cause of action. In Buckman, the plaintiff alleged, as a sole cause of action, that the defendant, who served as a regulatory consultant to a medical device manufacturer, made fraudulent misrepresentations to the Food and Drug Administration ("FDA"), in order to secure clearance to market the manufacturer's medical device. There, the plaintiffs employed a "but for" argument: "Had the representations not been made, the FDA would not have approved the devices, and plaintiffs would not have been injured." Id. at343.

In rejecting that argument, and in extending implied preemption, so as to preclude such a claim, the Court first noted that a "fraud-on-the-agency" claim is uniquely Federal, where the agency is a part of the Federal Government, and "is hardly 'a field which the States have traditionally occupied,' such as to warrant a presumption against finding federal preemption of a state-law cause of action." Id. at 347. The Court went on to note the substantial power afforded to the FDA so as to police for such fraud, and the flexibility that the agency was empowered to exercise in addressing

the critical needs of the medical device market. The Court reasoned that fraud-on-the agency claims could discourage potential applicants from seeking licensure for medical devices if "complying with the FDA's detailed regulatory regime" would cast the applicants in "the shadow of 50 States' tort regimes." Id. at 349. As the Court reasoned:

> Conversely, fraud-on-the-FDA claims would also cause applicants to fear that their disclosures to the FDA, although deemed appropriate by the Agency, will later be judged insufficient in state court. Applicants would then have an incentive to submit a deluge of information that the Agency neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application. As a result, the comparatively speedy §510(d) process could encounter delays, which would, in turn, impede competition among predicate devices and delay health care professionals' ability to prescribe appropriate off-label uses.

Id. at 351.

Here, the Defendant characterizes the Plaintiff's contention, that the Defendant failed to record test results as a "No test," as a variant of a purported fraud-on-the-agency claim, which is preempted by VSTA, under the rule expressed in Buckman.

Of course, the simplest response to this assertion is that the Plaintiffs, here, have failed to allege a "fraud-on-the-agency" claim in their Complaint. We understand the Defendant's misapprehension, as the Plaintiff's argument has suggested some form of conscious duping of APHIS, by the Defendant, but the argument finds

no substance in either the allegations of the Plaintiffs' Complaint, nor in the facts presented in this Record. If, as the Defendant perceives, the Plaintiffs are asserting some fraud-on-APHIS, by the Defendant's regulatory disclosures, it is a perception that, upon the Record here presented, APHIS has not joined.[8] More importantly, we read Buckman as expressly distinguishing the Supreme Court's prior holding in Medtronic. As the Court reasoned:

> Notwithstanding the fact that Medtronic did not squarely address the question of implied pre-emption, it is clear that the Medtronic claims arose from the manufacturer's alleged failure to use reasonable care in the production of the product, not solely from the violation of FDCA requirements. * * * In the present case, however, the fraud claims exist solely by virtue of the FDCA disclosure requirements. Thus, although Medtronic can be read to allow certain state-law causes of actions that parallel federal safety requirements, it does not and cannot stand for the proposition that any violation of the FDCA will support a state-law claim.

Id. at 352-53.

---

[8]Although APHIS expressed disapproval of the Defendant's report of viricidal test results, in June of 1998, the Record is devoid of any suggestion, let alone a showing, that APHIS regarded the report as a "fraud," a "misrepresentation," or a "false statement." Rather, APHIS appears to take exception to the statistical basis upon which that report of viricidal results was based. One can be guilty of an erroneous, statistical computation -- if one there be -- without imputing demonic purposes, and this Record intimates no underhandedness on the Defendant's part. While APHIS withheld PB13 from the marketplace, in January of 2000, there is nothing to suggest, as but one example, that the Defendant's licensure, as a manufacturer of animal biotics, was ever so slightly in jeopardy. If such evidence exists, it is not disclosed in this Record.

Notably, the Supreme Court's holding in Medtronic was expressly considered by our Court of Appeals in Symens I, and did not deter the Court from concluding that "broadly pleaded claims are pre-empted[, under "VSTA as construed by APHIS,] to the extent that they rely upon 'liability-creating-premises' that are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, purity, or labeling of [APHIS] licensed vaccines." Symens I, supra at 1055 and 1056. As a consequence, we find nothing in Buckman which alters the holdings in Symens I and II, at least on the Record presented here.

B. Legal Analysis. Since they involve distinct analytical considerations, we separately address the Plaintiffs' causes of action for strict liability, for negligence, and for a breach of implied warranties, from their causes of action for a breach of express warranties, and for false representation.

1. The Plaintiffs' Claims for Strict Liability, for Negligence, and for a Breach of Implied Warranties.

As we have briefly recounted, on June 26, 1998, the Defendant submitted to APHIS, on Form 2008, the results of the viricidal activity test, which had been performed on serial PB13, in order to secure permission for the release of that serial to the public. See, Exhibit D to Affidavit of Christina Furseth of July 3, 2001. Solely on the basis of the results disclosed on that Form

2008, APHIS authorized the release of that serial on June 28, 1998. Although APHIS was empowered to do so, in conjunction with its consideration of the safety, efficacy, potency, purity, or labeling of that serial, APHIS did not request copies of the Defendant's Bench Records which related to that viricidal activity test, nor did it elect to defer a decision on the release of that serial until APHIS had secured confirming test results.

The Defendant did not hear further from APHIS, as to serial PB13, until December of 1999, or January of 2000 -- about a year and one-half after APHIS's clearance of BP13. At that time, APHIS requested copies of the Bench Records that pertained to that serial. In a letter dated January 6, 2000, a representative of APHIS confirmed an earlier telephone call, on that same date, in which the Defendant was directed to "immediately stop distribution and sale" of BP13, and to quarantine any remaining inventory." See, <u>Exhibit Q to Affidavit of H. Morrison Kershner of July 26, 2001</u>, at Bates No. TH01364. The letter explained further, as follows:

> This notification is based on a review by the Center for Veterinary Biologics (CVB) of your bench records. The records are deficient in determining the Viricidal Activity (VA) of these serials. See attached memo by Dr. James Tanner, Chief Statistician, CVB.
>
> The VA results should have been reported on the APHIS Form 2008 as "NO TEST" and repeated. Since this did not occur the products contain-

> ing these serials should not have been shipped before valid testing was completed. These serials were not Eligible For Release as reported on the APHIS Form 2008.

In his attached memorandum, Dr. Tanner stated as follows:

> The 50% infective dose ($ID_{50}$) values reported by the firm are correctly calculated by the Reed-Muench (RM) procedure. However, only one (Ref DA62 5/12/98) of the four assays resulted in a response in which the $ID_{50}$ can be meaningfully estimated by this method. The RM method is a procedure for interpolating between points and should not be used with data that do not encompass a 50% response. It is probably prudent to use only data that include the 50% response level regardless of the method of calculation, although there are procedures that can be used to exstapolate [sic] beyond the observed response based on fitting a distribution to the observed data.

Id. at Bates No. TH01366.

No where did either APHIS, or Dr. Tanner, identify any requirement, either in the Defendant's Outline of Production, or in the governing APHIS regulations, where the assay results, that had been submitted by the Defendant a year and one-half before, failed to comply with a published APHIS requirement. Rather, APHIS -- through Dr. Tanner -- expressed the view that a different calculation would be "probably prudent," but he did not so much as cite any particular treatise, text, or regulation, for that view.

Nonetheless, the Plaintiffs claim that, having failed to report the viricidal test results, in June of 1998, as a "NO TEST," the Defendant breached APHIS substantive standards. In further

support for that view, the Plaintiffs offer the opinion evidence of Dr. T. Michael Schwartz, who holds a doctorate in Veterinary Medicine. In a report dated January 26, 2001, Dr. Schwartz expressed his opinion that, "[b]ased on the applicable industry and scientific standards, the data set forth in th[e] June 22, 1998 bench record should have been reported as a 'no test.'" See, Attachment to Affidavit of Dr. T. Michael Schwartz dated July 24, 2001, at Bates No. 002546. Later, in the same report, Dr. Schwartz opines as follows:

> In reviewing the deposition testimony of Christina Furseth of United Vaccines, I realize she suggests that in 1998 there was no requirement to have greater than 50% positive and have less than 50% positive results among the test dilution results to make a valid calculation. While that may have then been the perceptions of Ms. Furseth and other United Vaccines personnel, such understanding was incorrect under industry and scientific standards. Attached is a copy of the original Reed-Muench article, published in 1938 but still regularly relied upon, which ordained the protocol for conducting these tests. You will note that the title of the article is "A Simple Method of Estimating 50% Endpoints." Based upon scientific and industry standards continuously applicable when ever the Reed-Muench test is used, including June of 1998, the failure to obtain a greater than 50% positive at any dilution required the test to be classified a "no test."

Id. at Bates No. 002547.

Absent from Dr. Schwartz's opinion is the slightest suggestion that APHIS required Reed-Muench computations to be calculated only on

test results showing over 50% positive, and less than 50% positive, reactions.

Instead, during the course of his deposition, which was taken on June 5, 2001, Dr. Schwartz testified as follows:

> Q. * * * Is there anything in the USDA standards which provides for the manner in which the virus titers are to be calculated?
>
> A. The exact methodology?
>
> Q. Correct.
>
> A. Nothing that I can remember in the one for the viricidal test.
>
> Q. Is there anywhere in the USDA standards which provides for the manner in which the Reed-Muench calculation is to be performed?
>
> A. Not that I'm aware of.

Deposition of Dr. T. Michael Schwartz, attached to the Affidavit of Scott P. Drawe of July 5, 2001, at pp. 43-44.

* * *

> Q. Did you rely on any documents other than the original Reed-Muench article for your opinion that a -- that in excess of 50 percent positives must be found at one dilution before it is a valid test?
>
> A. I know from historically dealing with USDA back as far as the 1970's, when we did seed lot testing of almost every one of our vaccines, that we were told that at that time in order to have a valid test for doing the master seed work was that was a requirement. That would have been about the middle of the 1970's.
>
> Q. Are you aware of any similar statement being made to United Vaccines?

A. No, I'm not.

Q. Is that statement that a number in excess of 50 percent positive at one dilution level is required published anywhere by the USDA?

A. Not that I'm aware of.

Id. at pp. 47-48.

* * *

Q. Dr. Schwartz, the only scientific article that you've cited in support of your opinion that at least 50 percent positive results at one dilution level are required for a valid Reed-Muench calculation is the Reed-Muench article itself; is that correct?

A. That's correct.

Q. As you sit here today, are you aware of any other articles or scientific writings that support that opinion?

A. I'm sure that other people have written on that subject, but I'm not aware of those. I'm sure that people have done that.

Q. Have you ever seen any other article than the Reed-Muench article that supports that proposition?

A. No, I have not.

Q. Now, the Reed-Muench article, is there anywhere in the Reed-Muench article that it specifically says that the calculation is not valid in the absence of at least 50 percent positive findings at one dilution?

A. Not that I'm aware of.

Id. at 68-69.

Given this state of the Record, we are hard-pressed to conclude that a published standard, or requirement of APHIS, was breached

when the Defendant reported the results of the viricidal activity test, on serial PB13, in June of 1998.

Absent from the Record is any showing that the protocol of the operative Outlines of Production, or any publication, or regulation, of APHIS, required that the results of such testing be reported only when a greater than 50 percent positive response was obtained. Apart from Dr. Tanner's view, that it was "probably prudent" that such a computation be based upon a greater than 50% response, even Reed-Muench expressed no such requirement in their original formulation of the statistical approach. See, Reed, L. and Muench, H., "A Simple Method of Estimating Fifty Per Cent Endpoints," The American Journal of Hygiene (Vol. 27, No. 3, May, 1938), attached to Affidavit of Dr. T. Michael Schwartz of July 24, 2001, at Bates No. 002554 - 022558.

In addition, we are presented with Dr. Schwartz's historic view that, when he completed such viricidal activity tests, in the mid-1970's, APHIS had insisted, at that time, that his results show a greater than 50 percent positive response if they were to be found valid under the Reed-Muench formula. This, however, says nothing about APHIS's requirements, as they existed in June of 1998, nor does it offer more than his conclusory impression, undergirded by ipse dixit, that, under "industry and scientific standards, which have been continuously applicable whenever the Reed-

Muench test is used, including June of 1998," "the failure to obtain a greater than 50% positive at any dilution required the test to be classified a 'no test.'" See, Report of Dr. T. Michael Schwartz of January 26, 2001, attached to the Affidavit of Dr. T. Michael Schwartz of July 24, 2001, at Bates No. 002547; see also, General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997)("Trained experts commonly extrapolate from existing data," "[b]ut nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert, as [a] court may conclude that there is simply to great an analytical gap between the data and the opinion proffered.").

Nonetheless, we cannot ignore the express observation of an APHIS representative, in January of 2000, that the Defendant's test results, from a year and one-half previously, should have been reported as a "NO TEST." Neither can we exclude the possibility that a greater than 50 percent positive response is as inseparable to Reed-Muench computations, as the mathematical pi is to the computation of the circumference of a circle -- rounding off pi to 3.00, for the ease of calculation, just will not do. We have no evidence, one way or the other, on this specific point and, therefore, we find the existence of a genuine issue of material fact

which precludes Summary Judgment on this basis.[9] In the absence, however, of an affirmative showing that APHIS published such a requirement, or that the requirement was otherwise disclosed to the Defendant, prior to June of 1998, or was scientifically subsumed in the Reed-Muench analytical framework, as recognized within the industry **and** APHIS, we could well be persuaded to reconsider Summary Judgment on this point.

The Plaintiffs argue that, where, as here, a Jury issue remains as to noncompliance with an APHIS requirement, the preemption slate is wiped clean, and they are at liberty to present any State law claim, even if it imposes requirements which may be different from those established by APHIS. Relying on the "bad batch" cases, the Plaintiffs argue that they should be permitted to demonstrate other experiments which, in their view, demonstrate that Biocom-DP was ineffective as a deterrent to mink distemper. See, e.g.,

---

[9]We have coursed the Record before us, and have found no evidence to demonstrate, as Furseth appears to suggest, that APHIS's reliance on a technical application of Reed-Muench was both after-the-fact, and without prior notice. The Defendant offers no showing that such computations, as were submitted in June of 1998, and in January and April of 2000, had been previously reviewed by APHIS representatives, and found to be acceptable. Nor does the Defendant directly counter Dr. Schwartz's opinion, that the industry and scientific standard, under the Reed-Muench paradigm, is not as Dr. Schwartz suggests. The Record is plain, however, that Furseth disagreed with the notion that a 50% positive result was required before an assay could be reported to APHIS as other than a "No test." Accordingly, this aspect of the Record presents a genuine, material issue of fact, that cannot legitimately be resolved upon Summary Judgment.

Gresham v. Boehringer Ingelheim Animal Health, Inc., 1996 WL 751126 (N.D. Ga., August 7, 1996); Silvey v. Mallinckrodt, Inc., 976 S.W.2d 497 (Mo.App. 1998). To the extent that the Plaintiffs read these decisions as allowing actions to proceed, on the off-chance that they may prove, at Trial, that the vaccine that they received from the Defendant was from a "bad batch," which may not have complied with APHIS's regulations in some presently unknown way, we find such a reading to be discordant with Symens I and II.[10]

As a result, we reject the Plaintiffs' "but for" argument -- namely, that "but for" the Defendant's failure to disclose a "NO TEST," in June of 1998, the Plaintiffs would not have suffered the losses they now claim. Since the only substantive requirement, that the Plaintiffs have identified as having been breached, is the

---

[10]We note that the District Court, in Symens v. SmithKline Beecham Corp., 19 F. Supp.2d 1062, 1067, 1068 (D.S.D. 1997), and in Sjovall v. SmithKline Beecham Corp., 16 F. Supp.2d 1112, 1116, 1117 (D.S.D. 1997), adopted the rationale of Gresham v. Boehringer Ingelheim Animal Health, Inc., 1996 WL 751126 (N.D. Ga. 1996), and both decisions were reversed, in part, by Symens I. Although the Court, in Symens I, cited Gresham for the proposition that pre-emption could be in whole, or in part, see Symens I, supra at 1056, quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 500 (1996), the Court remanded in order to afford the District Court an opportunity to complete "'a careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement to determine whether they fall within the intended pre-emptive scope' of the federal regime." Accordingly, we conclude that allowing State law actions to survive preemption, "even without a specific claim that a particular APHIS regulation has been violated," is inconsistent with the precedential authority of this Circuit. Cooper v. United Vaccines, Inc., 117 F. Supp.2d 864, 872 (E.D. Wis. 2000).

failure, in their view and, apparently, in the view of APHIS, to report the "NO TEST," that purported failure is the focus of our analysis. Unfortunately for the Plaintiffs, they can point to no evidence, in this Record, that the PB13 serial was not as the Defendant had reported to APHIS. The Plaintiffs have offered no competent showing that the serial, under the regulations of APHIS, or the Defendant's Out-line of Production, proved to be viricidal. Indeed, all of the evidence, which responds to the APHIS approved test for viricidal activity, proves to the contrary.

Accepting, as we must for these purposes, that the Defendant should have reported a "NO TEST" in June of 1998, the Defendant was entitled, under the APHIS regulations, to retest the serial. See, 9 C.F.R. §113.35(e). When APHIS raised the "NO TEST" issue to the Defendant's attention, in January of 2000, the Defendant retested the serial at the instance of Aphis and, to the satisfaction of APHIS, demonstrated that the serial was not viricidal. See, Exhibit P to Affidavit of H. Morrison Kershner of July 26, 2001, at Bates No. TH01109 ("Dr. Tanner has reviewed and is satisfied that both of the retested serials [i.e., including PB13] meet the validity requirements for conducting the Reed-Munch [sic] calculations of the data."). In addition, the Defendant completed another viricidal activity test in April of 2000, which also demonstrated that the serial was not viricidal. The Plaintiffs offer nothing to

controvert, let alone impeach, these showings and, indeed, the opinion testimony of Dr. Schwartz corroborates the nonviricidal results of those tests.[11] Apart from the viricidal testing results,

---

[11]In opposition to Summary Judgment, the Plaintiffs offered a second Affidavit from Dr. Schwartz, which substantively contradicted his deposition testimony that the Defendant's two retests of serial PB13 demonstrated, to his satisfaction, that the serial was not viricidal, and that, given the test results for the retest in January of 2000, "PB13 would be eligible and appropriately licensed for release[] for sale by the USDA." See, Deposition of Dr. T. Michael Schwartz, attached to Affidavit of Scott P. Drawe of July 5, 2001, at pp. 62-66. In his supplemental Affidavit of July 24, 2001, Dr. Schwartz accuses the Defendant of misrepresenting his testimony in these particulars, and he asserts that he could not vouch for the results of the tests because he was unable to verify that the tests were performed properly, and the results reported accurately. See, Affidavit of Dr. T. Michael Schwartz of July 24, 2001, at pp. 1-2.

Notably, Dr. Schwartz expressed no hesitation in endorsing those retest results at the time of his deposition, and no objection was raised to his opinions, as so expressed, when he was deposed. The Plaintiffs have proffered Dr. Schwartz as an expert, and experts can express opinions based on evidence of a type reasonably relied upon by experts in the particular field, which is precisely what Dr. Schwartz accomplished. See, Rule 703, Federal Rules of Evidence. If he felt discomfort as to the foundation for those opinions, he failed to express it at a time when any foundational objection could be cured. See, Rule 32(d)(3)(B), Federal Rules of Civil Procedure. We conclude, under long-standing Eighth Circuit jurisprudence, that Dr. Schwartz's attempt to distance himself from the opinions he expressed at the time of his deposition is ineffectual in creating a genuine issue of material fact. See, Herring v. Canadian Life Assurance Co., 207 F.3d 1026, 1030 (8th Cir. 2000), citing Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365-66 (8th Cir. 1983); see also, American Airlines, Inc. v. KLM Dutch Airlines, Inc., 114 F.3d 108, 111 (8th Cir. 1997). In any event, the Plaintiffs have not otherwise controverted the validity of the retests, as established by the Supplemental Affidavits of Christina J. Furseth, and the Affidavits of Janice M. Boyer, and Sarah A. Piontek.

the Plaintiffs have failed to identify any other standard or requirement of VSTA, as interpreted by APHIS, with which the Defendant failed to comply.

Of course, we are mindful of the Plaintiffs' contention that full compliance with the APHIS standards was not accomplished in June of 1998, when APHIS released PB13 for sale, but the Plaintiffs have failed to sustain their burden of demonstrating any substantive noncompliance -- they have failed to demonstrate that, according to APHIS standards and requirements, PB13 was viricidal. We understand the Plaintiffs to argue that their capacity to test PB13 for viricidal activity, according to APHIS standards, was hindered by the timing of their lawsuit, and the initiation of their related discovery, since the vaccines that the Plaintiffs had purchased from the Defendant bore an expiration date in May of 2000, and this civil action was not commenced until February of 2000. However, the first signs of a distemper outbreak, on the Plaintiffs' farm, is alleged to have been observed in August of 1998, which would have allowed the Plaintiffs fully twenty-one months, before the expiration date of the vaccines, to conduct viricidal activity tests in accordance with APHIS standards and requirements. To be sure, the Plaintiffs commissioned other field experiments, but they offer nothing to counter the uncontroverted evidence, in this

Record, that PB13 was not viricidal under APHIS standards and, as such, was eligible for licensure by APHIS.

The Plaintiffs underscore, however, that APHIS continued a hold on the release of PB13, notwithstanding the Defendant's submission of the retests, in January and April of 2000, and that, therefore, this demonstrates that any damage, that they had sustained, was attributable to the Defendant's product. Of course, no one can properly question the formidable powers of APHIS, under the regulations that it promulgated, to exercise its administrative authority to "prevent the preparation [and] sale * * * of any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product for use in the treatment of domestic animals * * *." Title 21 U.S.C. §154. Indeed, a strong argument could be made that, given the outbreaks of distemper, in mink ranches employing the Defendant's vaccine, APHIS was persuaded, by January of 2000, that the Defendant's Outline of Production, as augmented by APHIS's regulations, was not effectively screening that vaccine, but that realization, if it in fact existed, does not sustain the Plaintiffs' effort to enforce requirements which are different from, or in addition to, those promulgated by APHIS. Of necessity, the Plaintiffs would have to do so, since they have presented no proof that the only standard they have identified -- that of viricidal activity, as determined by APHIS -- was breached.

As the Court of Appeals noted, in Lynnbrook Farms, in promulgating its preemption regulations, APHIS expressly declared, "where safety, efficacy, purity, and potency of biological products are concerned, it is the agency's intent to occupy the field." Lynnbrook Farms v. SmithKline Beecham Corp., supra at 625, quoting 57 Fed.Reg. 38758, 38759 (August 27, 1992). Plainly, in occupying the field, APHIS can exercise regulatory powers that are denied to private litigants through State law claims, as "States are not free to impose requirements which are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, or purity of a product." Symens I, supra at 1053, quoting 57 Fed.Reg. 38758, 38759.

Apparently, the Plaintiffs would offer proof which, they claim, demonstrates that in a field test, crafted to simulate the conditions on their farm, the Defendant's product failed to properly immunize their mink. Accepting that proof as established, for this limited purpose only, it should be sufficient to note that APHIS did not require the Defendant to screen its vaccines -- including PB13 -- with the field test devised by, or similar to, that completed by the Plaintiffs. Were the Defendant now to be subject to such proof, plainly it would be subservient to requirements that would be different from, or in addition to, those pro-

mulgated by APHIS -- the agency which occupies this field of regulation.

Since each of the Plaintiffs' claims for negligence, strict liability, and for implied warranties of fitness for a particular purpose, or for merchantability, would impose requirements different from, or in addition to, those of APHIS, we grant the Defendant's Motion for Summary Judgment as to those claims.[12] See, SmithKline Beecham Corp., Civ. No. 94-103 at pp. 7-9 (D.S.D., September 30, 1999), aff'd, 248 F.3d 1166, 2001 WL 263058 (8th Cir., March 19, 2001); Lynnbrook Farms v. SmithKline Beecham Corp., supra at 630; Cooper v. SmithKline Beecham Corp., supra at 871; Brandt v. Marshall Animal Clinic, supra at 878. We recognize, as Courts generally do when addressing issues of preemption, that the result we reach appears harsh when squared with the just notion that every wrong, if proved, deserves a remedy. See, e.g., Lynnbrook Farms v. SmithKline Beecham Corp., supra at 630; Murphy v. SmithKline Beecham Corp., supra at 818; Brandt v. Marshall Animal Clinic, supra at 878. Nor do we think that it provides the Plaintiffs with much

[12]An exhaustive recitation of the elements of proof for each of these causes is unnecessary. Under Symens I and II, to be exempt from preemption, each of these claims would require proof that the Defendant violated a requirement of APHIS and, as we have already detailed, here that would require the Plaintiffs to demonstrate that PB13 was in fact, viricidal under APHIS's testing. The Plaintiffs have failed to meet that burden apart from offering, as proof, testing that was not imposed by APHIS.

solace to know that, had these claims been litigated in the Minnesota Courts, the same preemption would have been found to exist. See, Brandt v. Marshall Animal Clinic, supra at 818. Nevertheless, we are not jurisdictionally positioned to weigh the pros and cons of APHIS's preemption policy, nor are we at liberty to ignore the precedential authority, in this Circuit, that APHIS permissibly exercised the authority, which had been vested by VSTA, in creating a field of preemption which precludes the Plaintiffs' claims for negligence, for strict liability, and for breach of implied warranties.

2. The Plaintiffs' Claims for a Breach of Express Warranties, and for False Representation.

In their Complaint, the Plaintiffs predicate their express warranty claim upon two representations they attribute to the Defendant. First, they allege that, prior to their purchase of the Defendant's product, a representative of the Defendant stated to the Plaintiffs that the Defendant's mink vaccine was "95 percent effective in preventing distemper in mink." Plaintiffs' Complaint, at p. 2. In addition, the Plaintiffs allege that they "purchased and used the distemper vaccine in reasonable reliance upon material representations of facts and warranties made by defendant on the package label and insert, which included representations that the distemper vaccine 'aids in preventing distemper' and 'BIOCOM-DP has

been demonstrated to be a safe and efficacious aid in preventing distemper.'" Id. at p. 3. The Defendant does not deny that these representations were generally made, although, with respect to the "95 per cent effective" representation, the Defendant contends that it was subject to qualifications and conditions. See, Defendant's Reply Brief, at p. 17 n. 8.

In urging that the claim is not preempted, the Plaintiffs rely upon Cipollone v. Liggett Group, Inc., 505 U.S. 504 (1992)(plurality opinion), while the Defendant relies upon Cooper v. United Vaccines, Inc., supra at 871-72, in urging that the express warranty claim is preempted. We find that the Defendant is correct as to the label and insert representation, for APHIS approved that label and packaging, and a Jury would have no right, under State law, to question the propriety of that approval process, for that would invoke a requirement different from, or in addition to, the requirements established by APHIS. See, Cooper v. United Vaccines, Inc., supra at 872; Murphy v. SmithKline Beecham Corp., supra at 818 ("APHIS has also stated that states may not impose 'labeling requirements which are different from or in addition to those in the regulations under [VSTA].'"), quoting 57 Fed.Reg. at 38759; Symens I, supra at 1053 (same). Accordingly, the Plaintiffs' express warranty claim, which is predicated upon the labeling, and the packaging of the Defendant's product, is preempted, and the Defendant

is entitled to the entry of Summary Judgment as to that claim. Further, because the Plaintiffs' false representation claim, insofar as it relies upon a representation on the Defendant's label, or in its packaging, is but another variant of the express warranty claim we have found to be preempted, that aspect of the Plaintiffs' false representation claim is also preempted.

We think a different result is required, however, with respect to the "95 per cent effective" claim, as that does not emanate from the labeling or packaging of the Defendant's product, but appears to be a promotional representation employed by the Defendant's Director of Sales and Marketing. Although portions of the Record before us reflect that the same promotional statement was before the Court, in Cooper, see Exhibit G to Affidavit of Scott Drawe dated August 14, 2001, at p. 14, that decision merely refers to "statements allegedly made by [United Vaccines Inc.'s] representatives regarding the high 'field effectiveness' of the vaccine * * *." Id. There, the Court concluded that "[t]hese representations are not 'substantially different' from those set forth in the APHIS-approved labeling and packaging that accompanied Biocom-DP" "[a]nd, because they concern the efficacy of the vaccine, a jury would have to find that the vaccine was ineffective in order to return a verdict for [the plaintiff]." Id. Even though, as here, the plaintiffs, in Cooper, see Exhibit G to Affidavit of Scott

Drawe dated August 14, 2001, at p. 14, raised the Supreme Court's analysis in Cipollone, the Cooper Court did not address that decision in finding that the express warranty claim was preempted.

In Cipollone, the Court was considering the preemptive breadth of the Federal Cigarette Labeling and Advertising Act of 1965, and its successor, the Public Health Cigarette Smoking Act of 1969. The Court concluded that the Act did not preempt State law claims, which were premised upon express warranties, and reasoned as follows:

> A manufacturer's liability for breach of an express warranty derives from, and is measured by the terms of that warranty. Accordingly, the "requirement[s]" imposed by an express warranty claim are not "imposed under State law," but rather are imposed **by the warrantor.** If, for example, a manufacturer expressly promised to pay a smoker's medical bills if she contracted emphysema, the duty to honor that promise could not fairly be said to be "imposed under state law," but rather is best understood as undertaken by the manufacturer itself. While the general duty not to breach warranties arises under state law, the particular "requirement * * * based on smoking and health * * * with respect to the advertising or promotion [of] cigarettes" in an express warranty claim arises from the manufacturer's statements in its advertisements. In short, a common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a "requirement * * * **imposed under State law**" within the meaning of [Federal Cigarette Labeling and Advertising Act] §5(b).

Cipollone v. Liggett Group, Inc., supra at 525-26 [emphasis in original].

Subsequently, in American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995), the Supreme Court returned to the same line of analysis but, on this occasion, in determining the preemptive scope of the Airline Deregulation Act of 1978. Once again, the Court declined to extend preemption to State law express warranty claims, reasoning as follows:

> We do not read the [Airline Deregulation Act's] preemption clause * * * to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings. As persuasively argued by the United States, terms and conditions airlines offer and passengers accept are privately ordered obligations "and thus do not amount to State's 'enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law' within the meaning of [§] 1305(a)(1). * * * Cf. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 526, 112 S.Ct. 2608, 2612, 120 L.Ed.2d 407 (1992)(plurality opinion)("[A] common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a 'requirement * * * imposed under State law' within the meaning of [Federal Cigarette Labeling and Advertising Act] §5(b)."). A remedy confined to a contract's terms simply holds parties to their agreements -- in this instance, to business judgments an airline made public about its rates and services.

Id. at 228-29.

Cipollone has played a role in each of the decisions we have relied upon. In Murphy, the Court observed that, in Cipollone, the "Supreme Court examined statutory language similar to that con-

tained in the APHIS regulations," Murphy v. SmithKline Beecham Corp., supra at 816, while the Court, in Lynnbrook Farms, extensively examined the Court's holding, in Cipollone, when ascertaining the limits of the preemption limned by APHIS. See, Lynnbrook Farms v. SmithKline Beecham Corp., supra at 627-29. Our own Court of Appeals, in Symens I, considered Cipollone, and cited it for the proposition that "some" State common law claims were preempted as a result of the Court's analysis there. Symens I, supra at 1055; see also, Brandt v. Marshall Animal Clinic, supra at 877 (citing Cipollone for the proposition that the preemptive scope of the Federal Cigarette Labeling and Advertising Act "was governed only by its particular language so that the Act did not preempt such common law claims as express warranty or misrepresentation * * *.").

In Symens I, our Court of Appeals concluded that "there is strong evidence that APHIS did not intend to entirely preempt common law remedies." Symens I, supra at 1055. As expressed by APHIS, the intent to preempt was fostered by the concern that "additional or different requirements would thwart the Congressional intent regarding uniform national standards, and would usurp USDA's authority to determine which biologics are pure, safe, potent and efficacious." Lynnbrook Farms v. SmithKline Beecham Corp., supra at 625, quoting 57 Fed.Reg. 38758, 38759. Excluding express warranties from preemption would not frustrate "uniform

national standards," nor would it "usurp USDA's authority to determine which biologics are pure, safe, potent and efficacious." Rather, holding manufacturers to their promises, as to the safety of their products, would advance the purposes of the APHIS regulations, by either encouraging manufacturers not to make representations -- outside those approved by APHIS -- which they do not intend to honor, or by holding them responsible for the representations that they do voluntarily offer in promoting sales.

We wish to make plain that, unlike the circumstances considered by our Court of Appeals in Welchert v. American Cyanamid, Inc., 59 F.3d 69, 72 (8th Cir. 1995), where the Court was considering the preemptive breadth of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), we are not confronted, here, with representations which mirror those contained in the Defendant's labeling and packaging. In Welchert, the Court concluded that the express warranty claim of the plaintiff, there, was preempted, reasoning as follows:

> The express warranty claim of the [plaintiffs] is based entirely on the label's statement with regard to the herbicide's carryover effect. They have not alleged that [the defendant] made any other statements with regard to the product which might serve as the basis for their express warranty claim. As noted in Worm [v. American Cyanamid Co., 5 F.3d 744 (4th Cir. 1993)], federal regulation requires a pesticide manufacturer to provide labeling information about rotational crop restrictions. * * * [The defendant's] label statement on

> rotational crop use is thus a mandated disclosure, not a "voluntarily undertaken" promise.
>
> * * *
>
> In the present case, like Worm, the [plaintiff's] express warranty claim arose solely on the basis of a labeling statement specifically required by federal law and approved by the EPA. For the purposes of our preemption analysis in the present case, we believe that the Fourth Circuit's use of the phrase "required and approved by the EPA," when characterizing the label statement challenged by the plaintiff's in that case, properly limits the scope of FIFRA's preemption of state law breach of express warranty claims.

Id. at 72-73.

Here, the Defendant's promotional statement, that its product would be "95 per cent effective," was not required by any APHIS labeling requirement, at least as disclosed in this Record, and we are unable to conclude, as the Court did in Cooper, that the representation was "not 'substantially different'" from the statements "set forth in the APHIS-approved labeling and packaging that accompanied Biocom-DP." Cooper v. United Vaccines, Inc., supra at 872. To assure consumers, that a product is effective in preventing distemper -- to the extent of a finite, quantified percentage -- is starkly different from assuring that the product either "aids in preventing distemper," or "has been demonstrated to be a safe and efficacious aid in preventing distemper."

As a consequence, under the circumstances presented here, we conclude that the Plaintiff's express warranty claim is not pre-

empted by APHIS, and we deny the entry of Summary Judgment, in favor of the Defendant, on that claim. Moreover, because the Plaintiff's false representation claim, insofar as it relates to the "95 percent effective" assertion, constitutes the same claim, as that presented by the asserted express warranty but in different garb, we are persuaded that the claim properly eludes Summary Judgment. Again, holding the Defendant to assurances that it gave to the Plaintiffs, either knowing that the assurances were false, or without a sufficient basis to conclude that the assurances were true or false, does no more than hold the Defendant at its own peril for making statements, not required by APHIS regulations, which either are known to be false, or which are uttered with a disregard for their truth or falsity.[13] We are aware of no regulatory authority, in APHIS, which would be dissipated, in any respect, by allowing the Plaintiff's false representation claim to proceed.

As the Supreme Court explained, in Cipollone v. Liggett Group, Inc., supra at 528-529:

> [The] petitioner's fraudulent-misrepresentation claims that do arise with respect to ad-

---

[13]Of course, we make no such finding here for, under the Summary Judgment standard of review, we are obligated to assume the truth of the Plaintiffs' allegations, and all reasonable inferences that may be drawn from those allegations. Whether the representations were actually made, and the extent to which they were true or false, if made, remains to be proven at Trial.

> vertising and promotions (most notably claims based on allegedly false statements of material fact made in advertisements) are not pre-empted by [Federal Cigarette Labeling and Advertising Act] §5(b). Such claims are predicated not on a duty "based on smoking and health" but rather on a more general obligation [--] the duty not to deceive. * * *
>
> * * *
>
> State-law prohibitions on false statements of material fact do not create "diverse, non-uniform and confusing" standards. Unlike state-law obligations concerning the warning necessary to render a product "reasonably safe," state-law proscriptions on intentional fraud rely only on a single, uniform standard: falsity. Thus, we conclude that the phrase "based on smoking and health" fairly but narrowly construed does not encompass the more general duty not to make fraudulent statements. Accordingly, petitioner's claim based on allegedly fraudulent statements made in respondents' advertisements is not pre-empted by §5(b) of the 1969 Act.

The language employed by APHIS, that expresses its preemptive intent, also does not encompass, either directly or by implication, the more general duty that manufacturers owe to the consuming public, not to make false statements in its advertisements, or promotions, when those statements have not been approved by APHIS. We are confident that APHIS can properly police, and sanction, those false statements, if any there be, in statements offered to APHIS for incorporation into APHIS-approved labeling and packaging, but we are aware of no mechanism, at least as disclosed in this Record, which extends APHIS's policing powers to advertisements, or pro-

motional statements, which are not submitted to APHIS for approval. Accordingly, we find no tension between APHIS's occupying the field of regulating the "safety, efficacy, purity, and potency of biologic products," see 57 Fed.Reg. 38758, 38759, and allowing alleged false representation claims to proceed, as to promotional representations, which are not contained in APHIS-approved labeling and packaging.

Accordingly, as was the case with the Plaintiffs' express warranty claim, we grant the Defendant's Motion for Summary Judgment as to that aspect of the false representation claim which relates to statements contained in the Defendant's packaging and labeling of the vaccine in question, but we deny the Defendant's Motion as to the Plaintiff's false representation claim arising from the representation that the product would be "95 per cent effective."

NOW, THEREFORE, It is --

ORDERED:

1. That the Defendant's Motion for Summary Judgment [Docket No. 17], is GRANTED in part, and DENIED in part, as detailed in the text of this Order.

2. That the Plaintiff's Motion to Strike Affidavits and Reply Brief [Docket No. 37] is DENIED.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE